FILED

OCT 2 4 2006

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

U.S. BANKRUPTCY COURT
**ENTERED**

OCT 2 5 2006

Jon D. Ceretto, Clerk of Court
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | Case No. RS 05-13967 PC |
| SCOTT WILLIAM WRIGHT, | |
| Debtor. | Adversary No. RS 05-01301 PC |
| CHOICE HOTELS INTERNATIONAL, INC., | Chapter 7 |
| Plaintiff, | |
| v. | Date:  September 28, 2006 |
| SCOTT WILLIAM WRIGHT, | Time:  9:30 a.m. |
| Defendant. | Place:  United States Bankruptcy Court Courtroom 303 3240 Twelfth Street Riverside, CA 92501 |

**MEMORANDUM DECISION**

Plaintiff, Choice Hotels International, Inc. ("Choice Hotels") seeks a summary judgment against Defendant, Scott William Wright ("Wright") declaring its debt non-dischargeable under § 523(a)(6) of the Code.[1] The court, having considered the pleadings, evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[2] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

[2] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

# ORIGINAL

## I. STATEMENT OF FACTS

Choice Hotels, a Delaware corporation, is one of largest hotel franchise companies in the world. Choice Hotels' franchisees own and operate over 4,500 hotels, inns and resorts in 45 countries under various names, including COMFORT INN®, COMFORT SUITES®, QUALITY INN®, CLARION®, SLEEP INN®, RODEWAY INN®, ECONO LODGE® and MAINSTAY SUITES®. With respect to its COMFORT® inns, hotels and suites, Choice Hotels owns certain trademarks (collectively, "the COMFORT® marks") which are registered with the United States Patent and Trademark Office and used by Choice Hotels in advertising and marketing its COMFORT® accommodations and services.[3] Choice Hotels provides its franchisees with reservation services. COMFORT® customers can make a reservation with any of Choice Hotels' franchisees either on the Internet[4] or by using one of Choice Hotels' toll-free telephone numbers.[5]

Sometime in 1988, Wright began working with his father, Elmer Clifford Wright, manufacturing and selling footwear under the name "Happy Feet - The World's Most Comfortable Shoe" ("Happy Feet"). At the time, Happy Feet was operated by Dreamco International, d/b/a Dreamco International, Inc. ("Dreamco"), a California corporation, with its

---

[3] The COMFORT® marks include: (1) COMFORT INNS®, No. 1265290, registered on January 24, 1984; (2) COMFORT INN®, No. 1315180, registered on January 15, 1985; (3) COMFORT INN®, No. 1448467, registered on July 21, 1987; (4) COMFORT INN & Design®, No. 1316274, registered on January 22, 1985; (5) COMFORT INN & Design®, No. 1516053, registered on December 9, 1988; (6) COMFORT SUITES & Design®, No. 1405351, registered on August 12, 1986; (7) COMFORT & Design®, No. 1522980, registered on January 31, 1989; (8) COMFORT SUITES®, No. 1712482, registered on September 1, 1992; (9) COMFORT HOTEL & Design®, No. 1707467, registered on August 11, 1992; (10) COMFORT HOTEL®, No. 1712481, registered on September 1, 1992; (11) COMFORT®, No. 1788677, registered on August 17, 1993; (12) COMFORT INN & SUITES®, No. 2264702, registered on July 27, 1999, and (13) CS COMFORT SUITES & Design®, No. 2665525, registered on December 24, 2002.

[4] Choice Hotels owns the following internet domain names which incorporate the COMFORT® marks: comfortinn.com, comfortinns.com, comfortsuite.com, comfortsuites.com, comforthotel.com, comforthotels.com and choicehotels.com.

[5] Choice Hotels provides the following toll-free numbers for direct access to COMFORT INN® and COMFORT SUITES® reservation and information services: 1-800-4-CHOICE and 1-800-228-5150.

principal place of business in Corona, California.[6]  In 1990, Dreamco acquired the right to use

the toll-free number 1-800-266-3678, or "1-800-COMFORT," in conjunction with Happy Feet.

Wright boasted that the telephone number was placed on "every pair of shoes we made and

every piece of literature" concerning their business.[7]  Immediately after acquiring the toll-free

number, Wright began receiving telephone calls from COMFORT® customers seeking hotel

reservations.[8]  Initially, Wright simply advised the COMFORT® customers that they had

reached an incorrect number.  As the volume of calls increased, however, Wright decided to

diversify his business interests and seek opportunities in the travel service industry.

In 1996, Wright struck a deal with ANZ Travel ("ANZ"), an independent travel agent,

pursuant to which ANZ would make reservations for COMFORT® customers calling the "1-

800-COMFORT" number.  In consideration therefor, Wright was paid a portion of the 10%

commission received by ANZ under an existing travel service agreement with Choice Hotels.

Wright contends that ANZ booked approximately $1.2 million in room reservations with Choice

Hotels for COMFORT INN® and COMFORT SUITES® properties by September 1997, using

the "1-800-COMFORT" number.

On September 12, 1997, Choice Hotels terminated its travel service agreement with ANZ

for "unauthorized use of the Choice COMFORT® trademark" in the telephone number "1-800-

COMFORT" used to promote ANZ's travel services.[9]  On October 27, 1997, Choice Hotels

learned directly from Wright that Dreamco, not ANZ, owned the "1-800-COMFORT" telephone

number.  On December 2, 1997, Choice Hotels rejected Wright's overtures concerning use of the

---

[6]  Between 1988 and 1996, Dreamco's sole shareholder was Elmer Clifford Wright.  Wright became the sole
shareholder of Dreamco in 1996.

[7]  Declaration of Scott Wright in Opposition to Plaintiff's Motion for Summary Judgment, p.1, l.29 to p.2, l.1.

[8]  Wright admits that "[w]e were getting **thousands** of phone calls requesting Comfort products and services with a
majority requesting the Comfort Inn for hotel reservations."  Declaration of Scott Wright in Opposition to Plaintiff's
Motion for Summary Judgment, p.2, l.3-4.

[9]  Declaration of Paul C. Jorgensen in Support of Plaintiff's Motion for Summary Judgment, p.1, l. 12-16.

1   "1-800-COMFORT" number under an independent travel service agreement between Choice

2   Hotels and Dreamco, and demanded that Wright, Dreamco and ANZ permanently cease using

3   the 1-800-COMFORT number for travel industry related services.

4          For the next fourteen months, Wright continued to pursue an agreement with Choice

5   Hotels for use of Dreamco's 1-800-COMFORT telephone number in conjunction with Choice

6   Hotels' COMFORT® reservation services.  During such period, Wright limited his use of

7   Dreamco's 1-800-COMFORT number to shoe sales through Happy Feet.[10]  Wright persisted

8   despite the fact that his efforts to negotiate a deal were repeatedly rejected by Choice Hotels.

9          Between October 2001 and April 2002, Wright registered the domain names

10  "comfortcallcenter.com" and "1-800-comfort.com."  On August 7, 2002, Wright incorporated

11  Comfort Call Center, Inc. ("CCC") under the laws of the State of Nevada,[11] and drafted a

12  business plan for CCC aimed at profiting from the COMFORT® marks through his new

13  websites and reservation hotline.  CCC's business plan provided, in pertinent part:

14         Paragraph 1.0, under the heading "Executive Summary:"  "The Comfort Call Center will
           be a full service Contact and Reservation center . . . .  Our primary focus will be the
15         hotel industry with Comfort Inns and Comfort Inns & Suites."

16         Paragraph 1.2, under the heading "Mission:"  "Comfort Call Center . . . will function
           primarily as a Contact/Reservation center for the owners and sole proprietors of Comfort
17         Inns and Comfort Inns & Suites . . . ."  CCC's "[m]ain objective is to build our brand
           name 1-800-COMFORT."

18
           Paragraph 1.3, under the heading "Keys to Success" and subheading "Solid Customer
19         Base:"  Choice Hotels has "1,800 hotels in full operation and another 400 under
           construction" under the COMFORT INN® and COMFORT INN & SUITES® marks.

20
           Paragraph 1.3, under the subheading "Online Presence:"  CCC states its intent to use the
21         "1-800-COMFORT.COM" mark and domain name "to direct thousands of people to our
           website . . . ."

22
           Paragraph 4.0, under the heading "Market Analysis Summary:"  "COMFORT INN® and
23

24

25  ───────────────────

    [10]  Happy Feet ultimately ceased doing business in 2000.
26
    [11]  On November 11, 2003, CCC was registered to do business in the State of California.
27
                                              - 4 -

1    COMFORT INNS & SUITES® are "our primary target."[12]

2  In December 2002, CCC registered the following domain names: "1-888-comfort.com,"

3  "comfortgoldcard.com," "comfortsilvercard.com," "comfortbronzecard.com" and

4  "comfortowners.com." The domain names registered by Wright and CCC provided access to

5  two websites authored and designed by Wright which specifically referred to Choice Hotels'

6  COMFORT® marks, COMFORT INNS® and COMFORT INNS & SUITES®. By 2003,

7  Wright and CCC were soliciting business directly from Choice Hotels' franchisees for the call

8  center and websites. Wright admits sending approximately 2,000 facsimile solicitations to

9  owners of COMFORT INNS® and COMFORT INNS & SUITES®, asking that they visit his

10 websites and utilize CCC's call center and reservation services using the 1-800-COMFORT

11 number and CCC domain names and marks (collectively, the "Infringing marks" or "Infringing

12 domain names"). At no time did Choice Hotels consent to use of the COMFORT® marks or the

13 Infringing marks by either Wright, Dreamco or CCC.

14    On May 29, 2003, Choice Hotels filed a complaint against Wright, Dreamco and CCC in

15 Case No. CV-03-3785-RGK, styled Choice Hotels International, Inc. v. Scott Wright, et. al., in

16 the United States District Court, Central District of California, seeking an injunction and

17 damages for their unauthorized use of its Comfort® marks. Wright, who was represented by

18 counsel, filed an answer to the complaint on June 19, 2003. On August 19, 2003, the district

19 court entered a preliminary injunction enjoining Wright, Dreamco and CCC from using the

20 COMFORT® marks and advertising or marketing the 1-800-COMFORT number. On August

21 27, 2003, the court set the matter for a jury trial to begin on May 11, 2004.

22    On February 25, 2004, after a discovery period of approximately seven months,[13] Choice

23

24 _____

[12] Statement of Uncontroverted Facts in Support of Plaintiff Choice Hotels International, Inc.'s Motion for
25 Summary Judgment, p.5, l.21 to p.6, l.11.

[13] Prior to expiration of the discovery deadline on February 5, 2004, Choice Hotels served Wright with requests for
26 admission pursuant to Rule 36 of the Federal Rules of Civil Procedure and took his testimony by oral deposition
pursuant to Rule 30 of the Federal Rules of Civil Procedure. Choice Hotels also obtained the oral deposition of
27

1   Hotels filed a motion for summary judgment.  On April 6, 2004, Choice Hotel's motion was

2   taken under submission by the court.  Wright waited until April 9, 2004, to file a response and

3   supporting declaration in opposition to Choice Hotels' motion for summary judgment.  Choice

4   Hotels objected to Wright's response as untimely, but its motion to strike was denied on April

5   14, 2004.  On April 20, 2004, the district court entered an order granting Choice Hotels' motion

6   for summary judgment.  On May 11, 2004, the district court entered a judgment against Wright,

7   Dreamco and CCC, jointly and severally, permanently enjoining the defendants from using the

8   COMFORT® marks and the Infringing marks, and awarding Choice Hotels the sum of $45,720

9   in royalty fees for their unauthorized use of the COMFORT® marks and statutory damages

10  totaling $525,000 pursuant to the Anticybersquatting Consumer Protection Act ("ACPA").[14]

11          On April 21, 2005, Wright filed a voluntary petition under chapter 7 of the Code.  Choice

12  Hotels was listed in Schedule F as the holder of an unsecured, non-priority claim in the amount

13  of $570,720 by virtue of the judgment entered in the district court.  On July 25, 2005, Choice

14  Hotels timely commenced this adversary proceeding seeking a determination that the federal

15  district court judgment for $570,720, plus interest, is excepted from discharge pursuant to §

16  523(a)(6) of the Code.

17                                        II. DISCUSSION

18          This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

19  157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  Venue is

20  appropriate in this court.  28 U.S.C. § 1409(a).  To prevail under § 523(a)(6), the plaintiff must

21  establish the allegations of the complaint by a preponderance of the evidence.  Grogan v. Garner,

22  498 U.S. 279, 291 (1991); Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir. 2004).

23  Objections to the dischargeability of a debt are to be literally and strictly construed against the

24  objector and liberally construed in favor of the debtor.  See Quarre v. Saylor (In re Saylor), 108

25  _____

    Wright's father, Elmer Clifford Wright, on January 6, 2004.

26
    [14] Pub. L. No. 106-113, 113 Stat. 1536 (1999), codified at 15 U.S.C. § 1125(d).

27
                                        - 6 -

1  F.3d 219, 221 (9th Cir. 1997); Hayhoe v. Cole (In re Cole), 226 B.R. 647, 653 (9th Cir. BAP

2  1998).

3  A.  Standard for Summary Judgment

4         Summary judgment is appropriate "if the pleadings, depositions, answers to

5  interrogatories and admissions on file, together with the affidavits, if any, show that there is no

6  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7  matter of law." Fed. R. Civ. P. 56(c).[15]  The purpose of summary judgment is to avoid

8  unnecessary trials when there is no dispute as to the material facts before the court. Nw.

9  Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).

10        Under Rule 56(c), the moving party bears the initial burden of establishing that there are

11  no genuine issues of material fact to be decided at trial. Celotex Corp. v. Catrett, 477 U.S. 317,

12  322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). "A 'material

13  fact' is one that is relevant to an element of a claim or defense or whose existence might affect

14  the outcome of the suit. The materiality of a fact is thus determined by the substantive law

15  governing the claim or defense." T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d

16  626, 630 (9th Cir. 1987). Genuine issues of material fact are those "factual issues that make a

17

18  [15] Rule 56 of the Federal Rules of Civil Procedure, applicable to adversary proceedings by virtue of Rule 7056,
    provides for the summary adjudication of issues:

19

20        **(c) Motion and Proceedings Thereon** . . . The judgment sought shall be rendered forthwith if the
          pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
          any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

21        judgment as a matter of law . . .

22        . . .

23        **(e) Form of Affidavits; Further Testimony; Defense Required** . . . When a motion for summary
          judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere

24        allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as
          otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

25        If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the
          adverse party.

26
    Fed. R. Civ. P. 56(c) & (e).

27
                                                  - 7 -

1  difference to the potential outcome and 'that properly can be resolved only by a finder of fact

2  because they may reasonably be resolved in favor of either party.'" Svob. v. Bryan (In re

3  Bryan), 261 B.R. 240, 243 (9th Cir. BAP 2001) (quoting Anderson, 477 U.S. at 250).  In other

4  words, a material fact is "genuine" if "the evidence is such that a reasonable jury could return a

5  verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

6        Choice Hotels, as the movant, has the initial burden of production to establish that there

7  is no genuine issue as to any material fact and that it is entitled to a summary judgment as a

8  matter of law.  Choice Hotels' burden of production is also affected by its burden of persuasion.

9  When the movant has the ultimate burden of persuasion, the movant must submit evidence

10  establishing that it is entitled to judgment as a matter of law even in the absence of an adequate

11  response by the nonmovant.  See, e.g., N. Slope Borough v. Rogstad (In re Rogstad), 126 F.3d

12  1224, 1227 (9th Cir. 1997) (stating that it is error to grant a motion for summary judgment simply

13  because there is no opposition); Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993)

14  (observing that summary judgment is improper where the moving papers are insufficient to

15  support the motion or on their face reveal a genuine issue of material fact); Hoover v. Switlik

16  Parachute Co., 663 F.2d 964, 967 (9th Cir. 1981) (stating that even in the absence of evidence in

17  support of the opposition, summary judgment should not be granted if the evidence in support of

18  the motion is insufficient).

19        Once the moving party's burden is met by presenting evidence which, if uncontroverted,

20  would entitle the moving party to a directed verdict at trial, the burden then shifts to the

21  respondent to produce "significantly probative evidence" of specific facts showing there is a

22  genuine issue of material fact requiring a trial.  T.W. Elec. Serv., 809 F.2d at 630, citing First

23  Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968).  The respondent "will not be able to

24  withstand a motion for summary judgment merely by making allegations; rather, the party

25  opposing the motion must go beyond its pleadings and designate specific facts by use of

26  affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue

27

- 8 -

1  for trial." In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002). A mere "scintilla"

2  of evidence supporting the respondent's position will not be sufficient. Anderson, 477 U.S. at

3  247-48.

4      In deciding whether a fact issue has been created, the court must view the facts and the

5  inferences to be drawn therefrom in a light most favorable to the nonmoving party. See Jonas v.

6  Resolution Trust Corp. (In re Comark), 971 F.2d 322, 324 (9th Cir. 1992). All reasonable doubt

7  as to the existence of genuine issues of material fact must be resolved against the moving party.

8  Anderson, 477 U.S. at 248. Inferences may also be drawn from underlying facts that are not in

9  dispute. T.W. Elec. Serv., 809 F.2d at 631. "Where the record taken as a whole could not lead a

10  rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial."

11  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

12  B. Willful and Malicious Injury

13      Section 523(a)(6) of the Code excepts from discharge debts resulting from "willful and

14  malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §

15  523(a)(6). A "deliberate or intentional injury" is required before § 523(a)(6) will render a debt

16  nondischargeable. See Kawaaukau v. Geiger, 523 U.S. 57, 61 (1998) (stating that

17  nondischargeability under § 523(a)(6) "takes a deliberate or intentional injury, not merely a

18  deliberate or intentional act that leads to injury").

19      Section 523(a)(6) requires separate findings on the issues of "willful" and "malicious."

20  The "willful" injury requirement of § 523(a)(6) is met "when it is shown either that the debtor

21  had a subjective motive to inflict injury or that the debtor believed that injury was substantially

22  certain to occur as a result of his conduct." Carrillo v. Su (In re Su), 290 F.3d 1140, 1144 (9th

23  Cir. 2002) (quoting Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir.), cert. denied,

24  533 U.S. 930 (2001)). A "malicious injury" involves "(1) a wrongful act, (2) done intentionally,

25  (3) which necessarily causes injury, and (4) is done without just cause or excuse." Id. at 1146-47

26  (quoting Jercich, 238 F.3d at 1209). See, e.g., Diamond v. Kolcum (In re Diamond), 285 F.3d

27

1  822, 829 (9th Cir. 2002) (holding that a state court jury finding that the debtors "intentionally

2  caused injury" to the creditor "without just cause" was entitled to preclusive effect for purposes

3  of § 523(a)(6)); Murray v. Bammer (In re Bammer), 131 F.3d 788, 791 (9th Cir. 1997) (en banc)

4  (stating that malice under § 523(a)(6) "does not require a showing of biblical malice, *i.e.,*

5  personal hatred, spite or ill-will").

6  C.  Issue Preclusion

7        Choice Hotels asserts that it is entitled to a summary judgment on its § 523(a)(6) claim

8  given the preclusive effect of the summary judgment entered by the district court in the prior

9  lawsuit between the parties.  While conceding that bad faith or intent were not essential elements

10 of its causes of action in the district court,[16] Choice Hotels claims that the district court's

11 findings with respect to Wright's violation of the ACPA satisfy the "willfulness" and

12 "maliciousness" requirements of § 523(a)(6).  Wright disagrees, arguing that the issues of

13 "willfulness" and "maliciousness" were not "raised, actually litigated or necessary" to either

14 Choice Hotels' claims in the prior action or the judgment entered in the case.  Wright also

15 reasons that none of the issues were "actually litigated" in the previous suit because he neither

16 conducted discovery nor timely opposed Choice Hotels' motion for summary judgment.

17

18

---

19 [16]  Fraudulent or wrongful intent is not an essential element of unfair competition or infringement of a registered

20 trademark.  See, e.g., Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1132 n.12 (9th Cir. 1988)
(stating that "[a]bsence of malice is no defense to trademark infringement"); E.&J. Gallo Winery v. Gallo Cattle Co.,

21 967 F.2d 1280, 1293 (9th Cir. 1993) (observing that "[a] party claiming trademark infringement need not demonstrate
that the alleged infringer intended to deceive consumers"); U-Haul Int'l, Inc. v. Jartran, Inc., 522 F. Supp. 1238,

22 1254 (D. Ariz. 1981), aff'd, 681 F.2d 1159 (9th Cir. 1982) (stating that "[i]ntent to confuse or mislead is not an
element of a cause of action under the Lanham Act").  In S.C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129 (6th Cir.

23 1959), the Sixth Circuit observed:

24        While fraudulent intent is not an essential element of infringement of a trademark, it is entitled to
       consideration.  Motivation is an important factor in the determination of such an issue.  Trademark

25     infringement does not depend upon a fraudulent intent; and good faith is no defense, if the mark used is
       likely to result in confusion or mistake.  But the court has the right, in determining the likelihood of
       confusion, to consider the motive of the party who adopts the mark.

26

27 Id. at 142 (citations omitted).

1    Collateral estoppel, or issue preclusion,[17] applies to nondischargeability proceedings in

2  bankruptcy court. <u>Grogan</u>, 498 U.S. at 284 n.11; <u>Cal-Micro, Inc. v. Cantrell (In re Cantrell)</u>, 329

3  F.3d 1119, 1123 (9th Cir. 2003); <u>Khaligh v. Hadaegh (In re Khaligh)</u>, 338 B.R. 817, 824 (9th Cir.

4  BAP 2006).  Issue preclusion prevents a party from relitigating an issue that the party has

5  actually litigated and lost in a prior proceeding.  <u>See</u> <u>R.T.C. v. Keating</u>, 186 F.3d 1110, 1114 (9th

6  Cir. 1999); <u>Roussos v. Michaelides (In re Roussos)</u>, 251 B.R. 86, 92 (9th Cir. BAP 2000).  Issue

7  preclusion serves to protect litigants from multiple lawsuits, conserve judicial resources, and

8  encourage reliance on adjudication by reducing the likelihood of inconsistent decisions.  <u>Allen v.</u>

9  <u>McCurry</u>, 449 U.S. 90, 94 (1980); <u>Montana v. United States</u>, 440 U.S. 147, 153-54 (1979).  <u>See</u>

10  <u>generally</u>, C. Klein, et. al., <u>Principles of Preclusion and Estoppel in Bankruptcy Cases</u>, 79 Am.

11  Bankr. L.J. 839, 852-58 (2005).

12    The preclusive effect of a prior federal district court judgment is determined by federal

13  law.  <u>See, e.g.</u>, <u>Fed. Deposit Ins. Corp. v. Daily (In re Daily)</u>, 47 F.3d 365, 368 (9th Cir. 1995)

14  (applying federal law to determine the preclusive effect of a prior federal judgment in an action

15  under the Racketeer Influenced and Corrupt Organizations Act ("RICO")); <u>Robi</u>, 838 F.2d at 322

16  (stating that "we apply California law of <u>res judicata</u> to the California judgment, New York law

17  to the New York judgment, and federal law to the federal judgments"); <u>Genel Co. v. Bowen (In</u>

18

19   [17]  In <u>Robi v. Five Platters, Inc.</u>, 838 F.2d 318 (9th Cir. 1988), the Ninth Circuit explained the concepts of issue

20  preclusion and claim preclusion, stating:

21      Generally, the preclusive effect of a former adjudication is referred to as "<u>res judicata</u>."  The doctrine of <u>res</u>
      <u>judicata</u> includes two distinct types of preclusion, claim preclusion and issue preclusion.  Claim preclusion

22      treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on
      the same claim or cause of action.  Claim preclusion prevents litigation of all grounds for, or defenses to,

23      recovery that were previously available to the parties, regardless of whether they were asserted or
      determined in a prior proceeding.

24      The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated
      and necessarily decided in a prior proceeding.  In both the offensive and defensive use situations the party

25      against whom estoppel [issue preclusion] is asserted has litigated and lost in an earlier action.  The issue
      must have been actually decided after a full and fair opportunity for litigation.

26

27  <u>Id</u>. at 321-22 (citations and quotations omitted).

1  re Bowen), 198 B.R. 551, 555 (9th Cir. BAP 1996) (stating that "we apply federal law to

2  determine the preclusive effect of a prior federal diversity judgment").  Under federal law, issue

3  preclusion may be raised offensively[18] when "(1) there was a full and fair opportunity to litigate

4  the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue

5  was lost as a result of a final judgment in that action; and (4) the person against whom collateral

6  estoppel is asserted in the present action was a party or in privity with a party in the previous

7  action."  U.S. Internal Revenue Serv. v. Palmer (In re Palmer), 207 F.3d 566, 568 (9th Cir. 2000);

8  Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992).

9       Issue preclusion may apply despite the fact that the prior determination is based upon an

10  unopposed motion for summary judgment rather than a trial.  Stevenson v. Sears, Roebuck &

11  Co., 713 F.2d 705, 712 (Fed. Cir. 1983); U.S. v. Gottheiner (In re Gottheiner), 703 F.2d 1136,

12  1140 (9th Cir. 1983).  In such a case, the "actual litigation" requirement is satisfied if the party

13  had a full and fair opportunity to litigate the issue in the prior proceeding and, despite substantial

14  participation in the action, chose not to do so.  See, e.g., Palmer, 207 F.3d at 569 (holding that a

15  summary judgment obtained by the IRS against the debtor in a prior Tax Court proceeding,

16  which had been abandoned at the outset by the debtor, had no preclusive effect in a subsequent

17  action under § 523(a)(1)(C)); Daily, 47 F.3d at 368 (holding that a default judgment entered

18  against the debtor as a discovery sanction, after two years of active participation in the litigation,

19  was entitled to preclusive effect in a subsequent dischargeability proceeding between the

20  parties); Gottheiner, 703 F.3d at 1140 (holding that collateral estoppel was available to a creditor

21  who obtained an unopposed summary judgment after sixteen months of active participation by

22  the debtor).

23       There is no dispute that some of the essential elements of issue preclusion under federal

24  law are present in this case.  Choice Hotels and Wright were parties to the prior district court

25

26  [18] "[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979).

27
                                                        - 12 -

1  action.  The issues litigated in the district court, which form the basis for Choice Hotels' §

2  523(a)(6) claim against Wright in this proceeding, involved Wright's liability, if any, to Choice

3  Hotels for alleged service mark infringement, unfair competition, service mark dilution, and

4  registration of the Infringing domain names in violation of the ACPA.  Wright actively

5  participated in the lawsuit, and had a full and fair opportunity to litigate these issues in the prior

6  action.[19]  Wright lost in the prior action, and the summary judgment entered by the district court

7  against Wright is a final judgment on the merits.  To have issue preclusion, however, the issue

8  determined in the prior action must be <u>identical</u> to the issue presented in the current action.

9  <u>Cantrell</u>, 329 F.3d at 1123 (quoting <u>Harmon v. Kobrin (In re Harmon)</u>, 250 F.3d 1240, 1245 (9th

10  Cir. 2001)) (emphasis added).

11  D.  <u>Choice Hotels' Summary Judgment</u>

12         1.  <u>Service Mark Infringement and Unfair Competition</u>

13         A service mark is "a distinctive mark used in connection with the sale or advertising of

14  services, such as insurance, while a trademark is typically used to identify and distinguish

15  tangible goods." <u>Am. Int'l Group, Inc. v. Am Int'l Bank</u>, 926 F.2d 829, 830 n.1 (9th Cir. 1991).

16  Service marks are registrable and entitled to protection in the same manner as are trademarks.

17  <u>Id.</u>; <u>see</u> 15 U.S.C. § 1053.  Choice Hotels sought relief against Wright in the district court for

18  alleged service mark infringement and unfair competition in violation of §§ 32(a) and 43(a) of

19  the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a), respectively, and state law.[20]

20  _____

21  [19]  Wright's contention that the district court did not consider his untimely opposition to Choice Hotels' motion for
    summary judgment is belied by the record.  Wright filed his untimely opposition to Choice Hotels' motion for
    summary judgment on April 9, 2004.  On April 14, 2004, the district court denied Choice Hotels' motion to strike

22  Wright's untimely opposition.  An order granting Choice Hotels' motion for summary judgment was not entered
    until April 20, 2004.  Nor is there merit to Wright's assertion that his own failure to conduct discovery before

23  expiration of the court-imposed deadline of February 5, 2004, deprived him of a full and fair opportunity to litigate
    the issues before the district court.

24

25  [20]  Choice Hotels' state law claims included: (a) service mark infringement in violation of Cal. Bus. & Prof. Code §
    14340; (b) unfair competition in violation of Cal. Bus. & Prof. Code § 17200; (c) service mark dilution in violation
    of Cal. Bus. & Prof. Code § 14330; (d) trademark infringement and unfair competition under common law, and (e)

26  unjust enrichment.  The liability analysis for trademark infringement and unfair competition is essentially the same
    under federal, state and common law.  <u>See, e.g.</u>, <u>M2 Software, Inc. v. Madacy Entm't</u>, 421 F.3d 1073, 1080 (9th Cir.

27

1    Federal trademark law seeks to protect both an owner's investment in a mark as well as

2  consumers who have formed an association with the mark. See Qualitex Co. v. Jacobson Prods.

3  Co., 514 U.S. 159, 163-64 (1995); Avery Dennison, 189 F.3d at 873. Liability for trademark or

4  service mark infringement occurs when a person "use[s] in commerce any reproduction,

5  counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering

6  for sale, distribution or advertising of any goods or services on or in connection with which such

7  use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

8    Trademark infringement is established if the plaintiff demonstrates (1) ownership of a

9  valid, protectable mark, and (2) a likelihood of confusion, mistake or deception in the

10  defendant's use of the mark. See New West Corp. V. NYM Co., 595 F.2d 1194, 1198-1202 (9th

11  Cir. 1979); Charles Schwab & Co. v. Hibernia Bank, 665 F. Supp. 800, 803 (N.D. Cal. 1987).

12  "The core element of trademark infringement is the likelihood of confusion, i.e., whether the

13  similarity of the marks is likely to confuse customers about the source of the products." Official

14  Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting E.& J. Gallo Winery,

15  967 F.2d at 1290). Likelihood of confusion "exists when customers viewing [a] mark would

16  probably assume that the product or service it represents is associated with the source of a

17  different product or service identified by a similar mark." Fuddruckers, Inc. v. Doc's B.R.

18  Others, Inc., 826 F.2d 837, 845 (9th Cir. 1987) (quoting Lindy Pen Co. v. Bic Pen Corp., 725

19  F.2d 1240, 1243 (9th Cir. 1984)).

20    In holding that Wright's actions constituted service mark infringement and unfair

21  competition, the district court found that the COMFORT® marks, as federally registered

22  trademarks, were valid, protectable marks owned by Choice Hotels. See Brookfield Commc'ns.,

23

24  2005) (stating that "[t]he test for trademark infringement under state, federal, and common law is whether there will
be a likelihood of confusion"); Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 874 (9th Cir. 1999) (discussing the

25  substantial similarity between California's dilution statute and the Federal Trademark Dilution Act); Cleary v. News
Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994) (stating that the Ninth Circuit "has consistently held that state common

26  law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are
'substantially congruent' to claims made under the Lanham Act").

27

- 14 -

1  Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999) (stating that "registration of

2  the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie

3  evidence of the validity of the registered mark and of [plaintiff's] exclusive right to use the mark

4  on the goods and services specified in the registration"); Sengoku Works Ltd. v. RMC Int'l, Ltd.,

5  96 F.3d 1217, 1219 (9th Cir. 1996) (noting that "federal registration of the mark is prima facie

6  evidence that the registrant is the owner of the mark").  Wright offered no evidence to the

7  contrary.  Indeed, it was undisputed that Choice Hotels "began using the marks COMFORT®,

8  COMFORT INN® and COMFORT INNS® as early as June 1, 1981, and COMFORT SUITES®

9  at least as early as October 17, 1985, for hotel/motel services, hotel/motel reservation services

10  and related goods and services."[21]  After applying the eight factor test promulgated by the Ninth

11  Circuit in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979),[22] the district court further

12  held that a likelihood of confusion existed between the COMFORT® marks and the Infringing

13  marks because:

14      1.      The Infringing marks incorporated the word "comfort" as their dominant term,
              and the addition of the domain indicator ".COM" or the prefix "1-8--" or "1-888"
15            did nothing to differentiate the Infringing marks from the COMFORT® marks.

16  _____

17  [21] Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p.4, l.7-11.

18  [22] In Sleekcraft, the Ninth Circuit identified the following eight nonexclusive factors as relevant in determining
    likelihood of confusion:

19
20          1. strength of the mark;
            2. proximity of the goods;
            3. similarity of the marks;
21          4. evidence of actual confusion;
            5. marketing channels used;
22          6. type of goods and the degree of care likely to be exercised by the purchaser;
            7. defendant's intent in selecting the mark; and
23          8. likelihood of expansion of the product.

24  Id. at 348-49.  See, e.g., Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1076 (9th Cir. 2006)
    (stating that the Sleekcraft factors "are not applied mechanically; courts may examine some or all of the factors,
    depending on their relevance and importance"); Surfvivor Media, Inc. v. Survivor Prods., 406 F.2d 625, 631 (9th Cir.
25  2005) (explaining that "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong
    showings are made with respect to some of them"); Brookfield Commc'ns., 174 F.3d at 1054 (opining that some
26  Sleekcraft factors "are much more important than others, and the relative importance of each individual factor will
    be case-specific").

27
                                        - 15 -

2.  Choice Hotels and Wright each offered travel reservation services.

3.  Choice Hotels and Wright each used the Internet and toll-free numbers to market their services.

4.  Choice Hotels had used its COMFORT® mark for over twenty years and had devoted millions of dollars in advertising to make it a prominent name, and research on consumer awareness showed that there was a 97% awareness for the COMFORT INN® brand since 1999 and that awareness for COMFORT SUITES® had arisen from 69% in 1999 to 81% by 2002.

5.  Wright admitted to having adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks.

6.  Wright conceded that he received in excess of 330,000 calls annually by consumers looking for COMFORT® hotel information, indicating that consumer confusion existed.

7.  Wright intended to create a hotel/motel reservation call center for Choice Hotels' COMFORT® - brand franchisees and to provide services via the Internet and telephone, substantially identical to the travel services offered to COMFORT® customers by Choice Hotels.

Based on the foregoing findings, the district court determined that Wright was liable to Choice Hotels on its claims for service mark infringement and unfair competition.

Despite Wright's admission that he "adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks," the district court made no specific finding that Wright's infringement of the COMFORT® marks was either willful or intentional.[23] It was not necessary to do so. Actual knowledge and wrongful intent are not essential elements of either direct service mark infringement or unfair competition.[24] Whether Wright had actual knowledge of his infringement or the specific intent to siphon off the goodwill of Choice Hotels' COMFORT® marks were issues that were neither actually litigated nor necessary to the district court's summary judgment. Therefore, the judgment in favor of Choice Hotels on such claims in

---

[23] Wright's admission was relevant to the issue of likelihood of confusion. Under the Sleekcraft test, Wright's intent in selecting the mark was a factor to be considered by the district court in determining likelihood of confusion. If a defendant knowingly adopts a mark similar to another's, a court "must presume that the public will be deceived." M2 Software, Inc., 421 F.3d at 1079; Official Airline Guides, 6 F.3d at 1394.

[24] See Footnote # 16, supra. See also Rolex Watch U.S.A., Inc. v. Meece (In re Meece), 261 B.R. 403, 409 (Bankr. N.D. Tex. 2001) (observing that "[t]he statutory scheme focuses on the probable reaction of buyers, without a requirement of the subjective state of mind of the defendant").

- 16 -

1    the prior action does not merit issue preclusion in this adversary proceeding.  See <u>Atlantic</u>

2    <u>Recording Corp. v. Chin-Liang Chan (In re Chin-Liang Chan)</u>, 325 B.R. 432, 438 (Bankr. N.D.

3    Cal. 2005).

4              2.  <u>Service Mark Dilution</u>

5              Under the Federal Trademark Dilution Act of 1995 ("FTDA"),[25] the owner of a famous

6    mark is entitled to an injunction "against another person's use in commerce of a mark or trade

7    name, if such use begins after the mark becomes famous[26] and causes dilution of the distinctive

8    quality of the mark . . . ."  15 U.S.C. § 1125(c)(1).  "Dilution" is defined as "the lessening of the

9    capacity of a famous mark to identify and distinguish goods or services, regardless of the

10   presence or absence of (1) competition between the owner of the famous mark and other parties,

11   or (2) likelihood of confusion, mistake or deception."  15 U.S.C. § 1127.  Anti-dilution statutes

12   are intended to prevent "the gradual 'whittling away' of a trademark's value."  <u>Acad. of Motion</u>

13   <u>Picture Arts & Sciences v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1457 (9th Cir. 1991)

---

[25] Pub. L. No. 104-98, 109 Stat. 985 (1995), codified at 15 U.S.C. §§ 1125, 1127.

[26] The FTDA prescribes the following eight non-exclusive factors for consideration in determining whether or not a mark is "famous:"

    (A) the degree of inherent or acquired distinctiveness to the mark;

    (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

    (C) the duration and extent of advertising and publicity of the mark;

    (D) the geographical extent of the trading area in which the mark is used;

    (E) the channels of trade for the goods or services with which the mark is used;

    (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

    (G) the nature and extent of use of the same or similar marks by third parties; and

    (H) whether the mark was registered . . . on the principal register.

15 U.S.C. § 1125(c)(1).

- 17 -

1    (quoting 2 J. McCarthy, <u>Trademarks and Unfair Competition</u>, § 24:13 (2d ed. 1984)).   Dilution

2    is actionable because it impermissibly creates an association in the minds of consumers between

3    a famous mark and a different good or service.  <u>Playboy Enters., Inc. v. Welles</u>, 279 F.3d 796,

4    805 (9th Cir. 2002).   To prevail on a federal trademark dilution claim, a plaintiff must

5    demonstrate that (1) the mark is famous; (2) the defendant is making a commercial use of the

6    mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the

7    defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the

8    mark to identify and distinguish plaintiff's goods and services.  <u>Panavision Int'l, L.P. v.</u>

9    <u>Toeppen</u>, 141 F.3d 1316, 1324 (9th Cir. 1998).

10           In the district court action, Wright admitted that the COMFORT® marks were "well-

11   known and famous throughout California [and the United States]."[27]  Wright further admitted

12   that "[w]hen other companies used any form of 'comfort' in their advertising, it will always

13   point to Comfort Inn in the minds of consumers."[28]  Moreover, Choice Hotels established

14   through regular consumer awareness studies that "consumer awareness was at 98% for the

15   COMFORT INN® brand and 81% for the COMFORT SUITES® brand" in 2002.  Based on

16   these facts, the district court concluded that Choice Hotels' COMFORT® marks were famous,

17   and that the Infringing marks diluted the COMFORT® marks by causing a likelihood of

18   confusion which reduced the ability of the COMFORT® marks to identify only Choice Hotels'

19   goods or services.

20           In holding that Wright's Infringing marks diluted the COMFORT® marks in violation of

21   the FTDA, the district court made no specific finding that Wright's actions were either willful or

22   intentional.  Again, it was not necessary for the district court to do so because the FTDA focuses

23

24

25

26   [27]  Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p.5, l.29-30.

27   [28]  <u>Id</u>. at p.5, l.31-33.

1    on the likelihood of confusion through the "blurring and tarnishment" of famous marks,[29] not the

2    subjective intent of the defendant.  Had the district court found "willful intent," Choice Hotels

3    would have been entitled to a further recovery of actual damages and attorneys fees under the

4    FTDA.  11 U.S.C. § 1125(c)(2).  Because the district court was not required to find that Wright

5    acted either intentionally or willfully in holding that Wright's actions diluted the COMFORT

6    marks in violation of the FTDA, issue preclusion does not apply.

7        3.  Unjust Enrichment

8        Unjust enrichment is not a cause of action under California law.  McBride v. Boughton,

9    123 Cal. App.4th 379, 387 (2004); Melchior v. New Line Prods., Inc., 106 Cal. App.4th 779, 793

10   (2003).  It is, in fact, "a general principle, underlying various legal doctrines and remedies, that

11   one person should not be permitted to unjustly enrich himself at the expense of another, but

12   should be required to make restitution of or for property or benefits received, retained, or

13   appropriated, where it is just and equitable that such restitution be made, and where such action

14   involves no violation or frustration of law or opposition to public policy, either directly or

15   indirectly." Dinosaur Dev., Inc. v. White, 216 Cal. App.3d 1310, 1315 (1989).  Unjust

16   enrichment is synonymous with restitution.  McBride, 123 Cal. App.4th at 387; Melchior, 106

17   Cal. App.4th at 793.

18       A person is required to make restitution if he or she is unjustly enriched at the expense of

19   another.  Restatement (First) Restitution § 1 (1937); Ghirardo v. Antonioli, 14 Cal. 4th 39, 51,

20   924 P.2d 996, 1003 (1996).  Enrichment occurs when a person receives a benefit at another's

21   expense.  Restatement, supra, § 1, cmt. a; Ghirardo, 14 Cal.4th at 51, 924 P.2d at 1003.  "Benefit"

22   includes any form of advantage.  Restatement, supra, § 1, cmt. b; Ghirardo, 14 Cal.4th at 51, 924

23   P.2d at 1003.  Restitution may be appropriate where there has been partial performance of an

24   express contract, or fraud, accident or mistake in the formation of a contract.  See McBride, 123

25   _____

26   [29] "Blurring" occurs when another's use of a mark creates "the possibility that the mark will lose its ability to serve
as a unique identifier of the plaintiff's product." Panavision, Int'l, L.P., 141 F.3d at 1326 n.7.  "Tarnishment" occurs
"when a famous mark is improperly associated with an inferior or offensive product or service." Id.

27

1  Cal. App.4th at 388.  Alternatively, restitution may be awarded where the benefit received

2  resulted from a defendant's fraud, conversion or other tortious conduct.  In such a case, the court

3  implies a contract, notwithstanding the intention of the parties, to prevent unjust enrichment.  Id.

4        The district court granted summary judgment to Choice Hotels on its claim against

5  Wright for unjust enrichment, holding that Choice Hotels was entitled to "[p]ayment of a

6  $47,500 royalty fee by Defendants for the use of the COMFORT MARKS®."[30]  In so holding,

7  the district court found only that Choice Hotels "restricts the use of the COMFORT MARKS®

8  by others and requires a licensing fee to be paid for such use."[31]  The district court made no other

9  findings in support of its unjust enrichment award, including any finding that Wright violated an

10 independent duty to Choice Hotels arising from principles of tort law.  Restitution was awarded

11 to compensate Choice Hotels for the benefit received by Wright at its expense, i.e., Wright's

12 unauthorized use of the COMFORT® marks.  Because restitution does not necessarily require a

13 finding of a deliberate and intentional injury, the district court's ruling on Choice Hotels' unjust

14 enrichment theory has no preclusive effect in this § 523(a)(6) action.

15       4. Cybersquatting

16       Cybersquatting is the "deliberate, bad-faith, and abusive registration of Internet domain

17 names in violation of the rights of trademark owners." Virtual Works, Inc. v. Volkswagen of

18 Am., Inc., 238 F.3d 264, 267 (4th Cir. 2001) (quoting S. Rep. No. 106-140, at 4 (1999)).

19 Cybersquatters register "'well-known brand names as Internet domain names' in order to force

20 the rightful owners of the marks 'to pay for the right to engage in electronic commerce under

21 their own brand name.'" Id. (quoting S. Rep. No. 106-140, at 5).  Cybersquatting has been

22 described as "the Internet version of a land grab." Interstellar Starship Servs, Ltd. v. Epix, Inc.,

23 304 F.3d 936, 946 (9th Cir. 2002); Virtual Works, 238 F.3d at 267.

24       On November 29, 1999, Congress passed the ACPA making it illegal to register or use

25

26 [30]  Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p.7, l.27-28.

27 [31]  Id. at p.7, l.15-16.

- 20 -

1    with the bad faith intent to profit an Internet domain name that is "identical or confusingly

2    similar" to the trademark or domain name of another person or company.  15 U.S.C. §

3    1125(d)(1)(A).[32]  Under the ACPA, a person is a cybersquatter and is liable to the owner of a

4    protected mark if that person:

5        (i) has a <u>bad faith intent</u> to profit from [a mark]; and

6        (ii) registers, traffics in or uses a domain name that –

7            (I) in the case of a mark that is distinctive at the time of registration of the domain
name, is identical or confusingly similar to that mark;

8

9            (II) in the case of a famous mark that is famous at the time of registration of the
domain name, is identical or confusingly similar or dilutive of that mark . . . .

10    15 U.S.C. § 1125(d)(1)(A) (emphasis added).  A finding of "bad faith" is an essential element to

11    any cause of action under the ACPA.  <u>Intersteller Starship</u>, 304 F.3d at 946.  In determining

12    whether a person has "bad faith intent," Congress directed the courts to consider the following

13    nine nonexclusive factors:

14        1.    The trademark or other intellectual property rights of the person, if any, in the
domain name;

15

16        2.    The extent to which the domain name consists of the legal name of the person or a
name that is otherwise commonly used to identify that person;

17        3.    The person's prior use, if any, of the domain name in connection with the bona
fide offering of any goods or services;

18

19        4.    The person's bona fide noncommercial or fair use of the mark in a site accessible
under the domain name;

20        5.    The parties intent to divert customers from the mark owner's online location to a
site accessible under the domain name that could harm the goodwill represented

21            by the mark, either for commercial gain or with the intent to tarnish or disparage

22

23    [32] "A number of cybersquatting problems prompted Congressional action.  There was concern about individuals
registering domain names that are similar to famous marks for the purpose of profiting by selling them to the

24    legitimate owners of the marks.  Congress was also aware of individuals attaching obscene or pornographic material
to an infringing domain name in order to tarnish the mark.  Others attempted to divert unsuspecting consumers to

25    their sites in order to engage in unfair competition. . . .  The legislative history of the APCA includes findings that
cybersquatters were engaged in consumer fraud and creating public confusion as to the true source and sponsorship

26    of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial
revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable

27    intellectual property."  <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d 774, 778 (8th Cir. 2004) (citations omitted).

1        the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

2

    6.    The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

3

4

    7.    The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

5

6

7

    8.    The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

8

9

10

    9.    The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

11

12  15 U.S.C. § 1125(d)(1)(B)(i)(I) - (IX). In addition to the nine enumerated factors, a court may

13  rely on other indicia of bad faith intent to profit. Sporty's Farm, L.L.C. v. Sportman's Mkt., Inc.,

14  202 F.3d 489, 499 (2d Cir. 2000) (stating that "[t]he most important grounds for [a finding of

15  bad faith intent] are the unique circumstances of th[e] case, which do not fit neatly into the

16  specific factors enumerated by Congress but may nevertheless be considered under the statute").

17  The ACPA also contains a safe harbor provision explaining that bad faith intent "shall not be

18  found in any case in which the court determines that the person believed and had reasonable

19  grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C.

20  § 1125(d)(1)(B)(ii).

21        With regard to Choice Hotels' ACPA cause of action, the district court found that Wright

22  had a "bad faith intent to profit" from the Infringing domain names in using the COMFORT®

23  marks. Specifically, the district court determined that:

24    1.    Wright's "'late registration [of the domain names], without any prior bona fide use, demonstrates a bad faith intent to profit parasitically from Choice's

25

26

27

advertisement and reputation;'"[33]

2.    Wright had no federal, state or common law trademark rights in the Infringing domain names;

3.    None of the Infringing domain names were previously used by Wright as a business name;

4.    Choice Hotels' rights in the COMFORT® marks dated back to 1981, while the Infringing domain names were registered in 2001;

5.    The Infringing domain names provided access to commercial hotel/motel services;

6.    There was no evidence of any bona fide noncommercial use by Wright, and

7.    Wright created the Infringing domain names with the intent to divert consumer traffic from Choice Hotels' authorized websites.[34]

The district court further found that Wright's Infringing domain names diluted and were confusingly similar to the COMFORT® marks.[35]  Based on these findings, the district court held that Wright's attempts to profit in bad faith from Choice Hotels' famous COMFORT® marks violated the ACPA.  Choice Hotels was granted injunctive relief and awarded statutory damages under the ACPA of $525,000 ($75,000 for each of the seven Infringing domain names).

E.  Wright's Liability for Statutory Damages Under the ACPA is Nondischargeable

Notwithstanding the district court's specific finding of a "bad faith intent to profit" from the COMFORT® marks, Wright denies that his use of the COMFORT® marks was either willful or malicious.  Wright claims that his actions were motivated, not by a specific intent to harm Choice, but simply by a desire to benefit Choice Hotels as well as himself, describing his efforts to build a relationship with Choice Hotels as "a 'win-win' situation."[36]  Wright reasons that an

---

[33]  Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p.6, l.18-20 (quoting Order Granting Preliminary Injunction entered on August 18, 2003).

[34]  Id. at p.6, l.18 to p.7, l.3.

[35]  Id. at p.7, l.4-8.

[36]  Wright's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, p.5, l.13-15.

1  intent to profit, whether in good faith or bad faith, "does not, either expressly or impliedly, carry

2  with it any harm or injury to another."[37]  Wright also contends that, despite the district court's

3  award of statutory damages, Choice Hotels was not truly injured by his conduct because there is

4  no evidence of actual damages.  According to Wright, "[t]here is no evidence that [Choice

5  Hotels] was ever harmed by [Wright's] use of any of its marks."[38]

6       An award of statutory damages, which satisfies the criteria for a "willful and malicious

7  injury," constitutes a nondischargeable debt under § 523(a)(6).  Albarran v. New Form, Inc. (In

8  re Albarran), 347 B.R. 369, 383 (9th Cir. BAP 2006); Star's Edge, Inc. v. Braun (In re Braun),

9  327 B.R. 447, 452 (Bankr. N.D. Cal. 2005).  Before the trial court renders a final judgment, the

10  victim of cybersquatting in violation of the ACPA may elect "to recover, instead of actual

11  damages and profits, an award of statutory damages in the amount of not less than $1,000 and

12  not more than $100,000 per domain name, as the court considers just."  11 U.S.C. § 1117(d).

13  ACPA statutory damages serve "to deter wrongful conduct and to provide adequate remedies for

14  trademark owners who seek to enforce their rights in court."  See Pinehurst, Inc. v. Wick, 256 F.

15  Supp.2d 424, 432 (M.D.N.C. 2003) (quoting S. Rep. No. 106-140, at 8 (1999)).

16       Because a finding of "bad faith intent" is an essential element of an ACPA cause of

17  action, the court concludes that Wright's cybersquatting in violation of the ACPA constituted a

18  categorically harmful activity which necessarily caused injury to Choice Hotels within the scope

19  of § 523(a)(6).  See, e.g., Sicroff, 401 F.3d at 1106-07 (holding that libel necessarily caused

20  harm to a person's reputation and was a "malicious" injury where the debtor had conceded

21  "willfulness"); Albarran, 347 B.R. 369, 383 (9th Cir. BAP 2006) (concluding that "intentional

22  copyright infringement is a categorically harmful activity and thus is an 'injury,' as that term is

23  used in § 523(a)(6)"); Braun, 327 B.R. at 451 (concluding that "if conduct necessarily causes

24  harm, an independent finding of injury is unnecessary").

---

[37] Id. at p.4, l.19-21.

[38] Id. at p.4, l.24-25.

1        For purposes of the "willfulness" requirement of § 523(a)(6), the court may infer

2   subjective intent or substantial certainty from the facts and circumstances surrounding the

3   defendant's conduct. See, e.g., Su, 290 F.3d at 1146 n.6 (stating that "[t]he bankruptcy court

4   may consider circumstantial evidence that tends to establish what the debtor must have actually

5   known when taking the injury-producing action"); Albarran, 347 B.R. at 384 (stating that

6   "[s]ubjective intent or substantial certainty may be inferred from all of the facts and

7   circumstances established"). Wright was aware of Choice Hotels' rights in the COMFORT®

8   marks at the time of his infringement. On December 2, 1997, Choice Hotels instructed Wright

9   and Dreamco to cease their unauthorized use of the COMFORT® marks in the telephone

10   number, 1-800-COMFORT, to promote travel industry related services. After exhausting his

11   efforts to obtain a license from Choice Hotels to use the COMFORT® marks legitimately,

12   Wright incorporated the CCC and devised a plan to "parasitically" profit from the COMFORT®

13   marks without the consent of Choice Hotels. Wright admits acquiring the Infringing domain

14   names with the specific intent to divert COMFORT® customers and consumer traffic from the

15   Choice Hotels' authorized websites and to profit therefrom. The district court found that the

16   Infringing domain names were designed to provide access to commercial hotel/motel services,

17   and that there was no evidence of a bona fide noncommercial use by Wright. Furthermore,

18   Wright was no longer using the 1-800-COMFORT telephone number to sell shoes when the

19   Infringing domain names were registered in 2001. Happy Feet had already ceased doing

20   business. Simply put, when Wright illegally used the Choice Hotels' COMFORT® marks to

21   boost his own Internet traffic, he had actual knowledge that harm to Choice Hotels was

22   substantially certain to occur. See Su, 290 F.3d at 1146 (stating that debtor must have "actual

23   knowledge that harm to the creditor was substantially certain").

24        Having established that Wright's violation of the ACPA was willful and necessarily

25   caused injury to Choice Hotels, the court can imply malice. Thiara v. Spycher Bros. (In re

26   Thiara), 285 B.R. 420, 434 (9th Cir. BAP 2002) (observing that "the 'done intentionally' element

27

1  of a 'malicious' injury brings into play the same subjective standard of intent which focuses on

2  the [defendant's] knowledge of harm to the creditor"). Finally, the summary judgment evidence

3  supports a finding that Wright had no just cause or excuse for his actions. Wright acquired the

4  Infringing domain names with the specific intent to divert consumer traffic from Choice Hotels'

5  authorized websites despite having been informed repeatedly by Choice Hotels to cease and

6  desist his infringement. Wright offered no evidence in the prior action to establish a "safe

7  harbor" defense to his violation of the ACPA, i.e., that he believed, or had reasonable grounds to

8  believe, that use of the Infringing domain names constituted fair use or was otherwise lawful.

9  Nor has Wright produced significantly probative evidence of specific facts in response to Choice

10 Hotels' motion showing there is a genuine issue of material fact requiring a trial on this issue.

11        Accordingly, the court finds that Wright's violation of the ACPA was malicious in that it

12 was wrongful, done intentionally, necessarily caused injury to Choice Hotels, and was done

13 without just cause or excuse. Furthermore, the evidence supports a finding that Wright's

14 violation of the ACPA was willful because he had actual knowledge that harm to Choice Hotels

15 was substantially certain to occur as a result of his actions.

16                              III.  CONCLUSION

17        There being no genuine issue as to any material fact for trial, the court finds that Choice

18 Hotels is entitled to a summary judgment as a matter of law. For the foregoing reasons, Choice

19 Hotels' judgment for statutory damages against Wright in the amount of $525,000, plus interest

20 from May 11, 2004, is excepted from discharge under 11 U.S.C. § 523(a)(6).

21        A separate judgment will be entered consistent with this opinion.

22 Dated: October 24, 2006.

23                                        PETER H. CARROLL
                                         United States Bankruptcy Judge

24

25

26

27
                                        - 26 -

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| | |
|---|---|
| In re SCOTT WILLIAM WRIGHT,<br><br><br>Debtor. | CHAPTER 7<br><br>CASE NUMBER RS 05-01301 PC |

# NOTICE OF ENTRY OF JUDGMENT OR ORDER
# AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1.　You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled
*(specify)*: MEMORANDUM DECISION


was entered on *(specify date)*:

2.　I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and
entities on the attached service list on *(specify date)*:


Dated:

JON D. CERETTO
**Clerk of the Bankruptcy Court**

By: _____
*Deputy Clerk*

---

*Rev. 1/01*　This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.　**F 9021-1.1**

Service List


Scott William Wright
15181 Van Buren Blvd., #50
Riverside, CA 92504


Robert H. Brumfield, III
Kronick, Moskovitz, Tiedemann & Girard
1675 Chester Avenue, Suite 320
Bakersfield, CA 93301